## Feinstein v. Cion

*Martin S. Goodman*, for plaintiffs.

*Richard M. Rosenbleeth*, for defendants.

SPAETH, J., March 6, 1970.—

### NATURE OF THE CASE

This is an action for the specific performance of an agreement to sell real estate.

### FINDINGS OF FACT

1. On November 19, 1964, plaintiffs and defendants entered into a written agreement for the sale to plaintiffs by defendants of a tract of real estate at Roosevelt Boulevard and Faunce Street in the City of Philadelphia. The purchase price was $120,000, against which plaintiffs deposited $10,000. The tract was part of a tract owned by defendants and mortgaged to the Connecticut General Life Insurance Com-

pany. The Roosevelt Motor Inn is on the part of the tract to be retained by defendants.

2. On June 4, 1965, plaintiffs, with defendants' consent, assigned the agreement of sale to Northview Apartments, Inc., a corporation formed by plaintiffs to build and own an apartment building on the tract covered by the agreement of sale.

3. Section 15 of the agreement of sale provided: "The contract to be conditioned upon getting a release from the Mortgage Company for the real property. Seller will do all that is necessary and required to obtain such release."

4. The mortgagee and defendants evidently agreed upon the terms of the release. However, at settlement, the mortgagee, perhaps for the first time, requested defendants to submit evidence that the part of the tract to be retained by defendants would, after the conveyance, be in conformity with the zoning ordinance of the City of Philadelphia.

5. James Haney, the real estate broker who was involved in the transaction and present at the settlement, proceeded to the Department of Licenses and Inspections of the City of Philadelphia in an attempt to obtain the necessary zoning and use registration permit.

6. When Mr. Haney phoned to the settlement and informed the parties that the Department of Licenses and Inspections would not grant the permit, the settlement was continued by agreement until the permit could be obtained.

7. On June 8, 1965, a formal application for the permit was filed with the Department of Licenses and Inspections, and was denied for the following reasons:

"The application is for the sub-division of an existing lot into two (2) lots (sizes & location as shown in the application). Lot 'A' is a 2-story 109 family dwell-

ing (1-hskg. 108-roomers), restaurant and 103 accessory off-street parking spaces erected in 1960, with a rear yard 13′ 6″ in minimum depth, whereas the rear yard is required to be at least 20′ 0″ in minimum depth and whereas one parking space is required for each unit—109 parking spaces. Lot 'B' is to remain a vacant lot."

8. Defendants, fearful that the application and refusal would appear on the record and thereby jeopardize the future granting of a permit, advised the Department of Licenses and Inspections, by letter, on June 10, 1965, that Mr. Haney was not authorized to make any application on their behalf and requested that the record be cleared.

9. Defendants made no further effort to obtain the permit; nor did plaintiffs make any effort, instead instituting the present action on the theory that defendants had not done "all that [was] necessary and required" to obtain the release from the mortgagee, which action defendants resisted by contending that they had done what was necessary, i.e., request the permit, and that performance under the agreement had been frustrated not by any action or failure of theirs but by the city's refusal to issue the permit.

10. During the trial, one of defendants, George Shaeffer, testified that if defendants were not left in violation of the city's zoning ordinance, they would be prepared to transfer title to plaintiffs.

11. The court thereupon directed the parties to make further inquiry of the Department of Licenses and Inspections. Upon this inquiry being made, a representative of the department testified that the department had erred in refusing the application filed in June of 1965 (see finding of fact no. 7, above), and that a permit would be issued if certain parking requirements were met.

12. The trial was interrupted, and plaintiffs, with

defendants' permission, obtained the permit by having the architect who had designed the Roosevelt Motor Inn lay out the required number of additional spaces for parking on the appropriate plot plan.

13. It accordingly appeared that all issues between the parties had been resolved, and settlement was scheduled for August 22, 1968.

14. Settlement was not held, however, because defendants refused to proceed with it. Trial was then resumed.

## DISCUSSION

The court regards the case differently than the parties do. The question is not whether defendants did all that they were required to do under the agreement of sale, nor whether there was a "supplemental" or "secondary" agreement, and if there was, whether it is enforceable. Rather, the question is why the agreement of sale should not be enforced, and there is no reason why it should not be.

The agreement was not repudiated at the settlement; instead, the settlement was continued in the hope that the permit required by the mortgagee could be obtained, and the sale contemplated by the agreement consummated. Nor was the agreement repudiated when the present action was initiated, plaintiffs bringing suit on the agreement, and defendants simply answering, in effect, that the only reason they had not made the sale was because of the city's refusal to issue the permit. When defendant, George Shaeffer, testified at the trial that if the city were to issue the permit, defendants would be willing to make the sale, he stated explicitly what defendants' answer implied.

Apparently, what has occurred is that defendants, between the time of trial and the second settlement, decided that, after all, they would not make the sale. That decision is to be regarded in the same way as

such a decision made at the first settlement would be regarded; it is a breach of contract, and defendants' arguments about the Statute of Frauds and a new contract are beside the point.

Defendants' arguments are in any case, it may be noted, without merit.

Assuming that defendant George Shaeffer's testimony constituted a new agreement, it does not follow that he had to sign the agreement for it to be enforceable. The purpose of the Statute of Frauds, Act of March 21, 1772, 1 Sm. L. 389, sec. 1, 33 PS §1, is to prevent fraud by requiring that certain contracts be written and signed by the party to be charged; thus, the possibility of misunderstanding the terms of the contract is minimized. It is difficult to think of a better written record of the terms of a contract than occurred in this case. The original contract, which is the model for the new contract, is made an exhibit; a party to be charged states his name, and is sworn to tell the truth (an oath the Statute of Frauds does not require); and the party's name and his responses to questions regarding the terms of the new contract are transcribed, the party all the while being represented by counsel.

Nor does the Uniform Partnership Act of March 26, 1915, P. L. 18, part III, secs. 10 and 11, 59 PS §§32 and 33, prevent recovery on the agreement.

Defendants contend that the act requires that a partner have authority to make an agreement for his partners, and that the authority must be in writing where land is involved; and defendants assert that defendant, George Shaeffer, when he testified to the agreement at trial, had no such authority.

Section 10 of the act, 59 PS §32, provides, in part:

"(1) Where title to real property is in the partnership name, any partner may convey title to such property by a conveyance executed in the partnership

name; but the partnership may recover such property unless the partner's act binds the partnership under the provisions of paragraph (1) of section nine, or unless such property has been conveyed by the grantee or a person claiming through such grantee to a holder for value, without knowledge that the partner, in making the conveyance, has exceeded his authority.

"(2) Where title to real property is in the name of the partnership, a conveyance executed by a partner, in his own name, passes the equitable interest of the partnership, provided the act is one within the authority of the partner under the provisions of paragraph (1) of section nine."

The section referred to as paragraph (1) of section 9 is section 9 of the Uniform Partnership Act, supra, 59 PS §31. It provides, in part:

"(1) Every partner is an agent of the partnership for the purpose of its business, and the act of every partner, including the execution in the partnership name of any instrument, for apparently carrying on in the usual way the business of the partnership of which he is a member, binds the partnership, unless the partner so acting has in fact no authority to act for the partnership in the particular matter, and the person with whom he is dealing has knowledge of the fact that he has no such authority.

"(2) An act of a partner which is not apparently for the carrying on of the business of the partnership in the usual way, does not bind the partnership unless authorized by the other partners."

Thus, it appears that defendant, George Shaeffer, could convey defendant partners' property unless "in fact [he had] no authority to act for the partnership . . . and the person with whom he [was] dealing [had] knowledge of the fact that he [had] no such authority." Even if this court were to find, which it

does not, that Mr. Shaeffer did not have authority to act for the partnership, neither plaintiffs nor the court had any indication of this fact. Instead, every indication was that Mr. Shaeffer did have authority, for the reasonable conclusion, when a partner takes the stand and testifies as Mr. Shaeffer did, is that he has discussed his testimony with the other partners, and that they agree with it.

Defendants also suggest that the complaint must be dismissed as not brought by the real party in interest, which defendants say is plaintiffs' assignee, Northview Apartments, Inc. The assignment, however, was made with defendants' permission: Finding of fact no. 2, above.

The only remaining question is with respect to the allocation of taxes and interest for the years 1965 through 1969. Indeed, the resolution of this question apparently is for practical purposes the critical issue. Thus, at page 6 of defendants' brief it is said:

"Defendants do not contend that the Agreement is invalid, the contention is that despite the Agreement's validity, the granting of specific performance would be unfair and unjust under these circumstances."

It will be observed that this admission that the agreement is valid is consistent with the court's interpretation of the evidence, stated at the outset of this opinion. Defendants' assertion that it would be "unfair and unjust" to enforce the agreement is not only unsupported by the record but contrary to the record. As the trial demonstrated, it would have been a simple matter for defendants to have obtained the permit by challenging the refusal of it, either by requiring the person making the refusal to state the basis of the refusal, or by appealing from the refusal. In their brief, defendants argue that as a matter of law the provision in the agreement that they do "all that is nec-

essary and required" to obtain the mortgagee's release did not require them "to institute court proceedings to obtain the permit . . ." However, whether or not defendants were legally required to do more than they did is not the point; the point is whether as a matter of equity they should be relieved of their agreement. Since defendants concede that the agreement is legally valid, and since the permit has now been obtained, what defendants were legally required to do under the agreement is no longer an issue. By a slight effort, defendants could have avoided the delay between the first settlement and now. Plaintiffs suggest that defendants did not make this effort because defendants were looking for an "out." Whether or not this is so, defendants did not make the effort; and they have not shown why they did not. Accordingly, if enforcement of the agreement would impose a hardship on defendants, it is their own fault. It may also be noted that defendants have not shown that a hardship would be imposed; from all that appears, the price they will obtain under the agreement may be so advantageous that there will be no hardship.

It does not follow, however, that defendants should be required to pay all of the taxes and interest that have accrued. Although plaintiffs assert that defendants' letter of June 10, 1965, to the Department of Licenses and Inspections, withdrawing the application for a permit, "bar[red]" plaintiffs from taking any action, this court has found that the letter was only to clear the record: Finding of fact no. 8, above. If defendants were looking for an "out," plaintiffs were looking for a law suit. The inability to settle for the property on June 8, 1965, as originally planned, was a result of faulty preparation by both parties, and the subsequent litigation was the result of stubbornness by both parties. The testimony of the representative

of the Department of Licenses and Inspections shows that the conflict could have been readily resolved by a little investigation, by either party, into the reason for the department's refusal of the permit required by the mortgagee.

Under these circumstances, it is appropriate that the parties share equally in all taxes and interest expense during the period June 4, 1965, through August 22, 1968. However, all taxes and interest from August 22, 1968, through the date of final settlement shall be borne by defendants, for plaintiffs, having obtained the permit, were ready and willing to make settlement on that date, but defendants refused to.

## CONCLUSIONS OF LAW

1. The court has jurisdiction of the parties and of the subject matter.

2. The agreement of sale between the parties, dated November 19, 1964, and pertaining to a certain piece of ground at the northwest corner of Roosevelt Boulevard and Faunce Street, is valid and subsisting.

3. Plaintiffs are ready and willing to make settlement under the agreement, but defendants without proper reason have refused to make settlement.

## DECREE NISI

And now, March 6, 1970, defendants are ordered to convey to plaintiffs the real estate in question pursuant to the terms of the agreement of November 19, 1964, between plaintiffs and defendants. Plaintiffs shall submit a form of decree consistent with the opinion accompanying this decree nisi.

Unless exceptions are filed within 20 days, this decree nisi shall upon praecipe become a final decree.